**ROSS INDUSTRIES, INC.**

v.

**M/V GRETKE OLDENDORFF, Her Engines, Tackle, Etc. In Rem, and against Egon Oldendorff, In Personam.**

Civ. A. No. B–76–465.

United States District Court,
E. D. Texas,
Beaumont Division.

Jan. 21, 1980.

Hubert Oxford, III of Benckenstein, McNicholas, Oxford, Radford & Johnson, Beaumont, Tex., for plaintiff.

Jack Lee Allbritton of Fulbright & Jaworski, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT M. PARKER, District Judge.

### FINDINGS OF FACT

1. The Plaintiff, Ross Industries, through its agent, Stone Forwarding, contracted with Mercury Shipping Houston for the transportation of 30,000 bags of wheat flour from Beaumont, Texas to Jeddah, Saudi Arabia. This contract for shipment of the Plaintiff's cargo was consummated by a written agreement on July 7, 1975. Pursuant to the terms of the agreement, Plaintiff's cargo was delivered and loaded aboard the GRETKE OLDENDORFF in Beaumont on August 9, 1975.

On August 9, 1975, a bill of lading was issued, and it was signed "For and on Behalf of the Master" by Larry Renaud, an employee of Mercury Shipping Houston. This was a "clean onboard" and "freight prepaid" bill of lading.

2. Egon Oldendorff owns the GRETKE OLDENDORFF. Oldendorff delivered the vessel to Arabella on March 15, 1973, and the parties signed a document which purports to be a bareboat charter agreement. This document provided that Arabella was to obtain the prior approval of Oldendorff for all important legal transactions and for all matters exceeding normal business transactions involving the vessel.

On June 27, 1975, Oldendorff entered into a time charter party agreement with Triton International Carriers, Ltd. whereby the GRETKE OLDENDORFF was time chartered to Triton for a voyage from the United States to the Middle East. The charter party provided that the Master would sign bills of lading as presented by the Charterer; further, the Charterer and its agents were given authority to sign bills of lading for or on behalf of the Master.

3. Halfmoon Shipping Corporation, a corporation that does not own any assets and has no employees, is the whole owner of Arabella. Arabella was formed in 1971 as a wholly owned subsidiary of Halfmoon. Arabella owned no vessels and had no employees; the directors of Arabella were all employees of Oldendorff, a limited West German partnership. Egon Oldendorff formed Arabella to charter and hold title to vessels, but all management decisions involving these vessels were made by Egon Oldendorff. Egon Oldendorff and Arabella had

an agency agreement which provided that Egon Oldendorff was to act as chartering agent for all ships owned by Arabella.

4. Triton, the time charterer of the vessel, ceased business operations during the period following the vessel's departure for the Red Sea. On September 17, 1975, Oldendorff sent a radio message to the vessel instructing the ship to stay at Port Said and await further instructions before continuing the voyage. Following the bankruptcy of Triton, the time charter agreement terminated; on September 18, 1975, Egon Oldendorff, purportedly acting on behalf of Arabella, took over the management of the shipment of cargo on the vessel. Thus, Egon Oldendorff assumed responsibility for completion of the shipment contracts that Triton had entered into with Plaintiff and the other shippers who had cargo aboard the vessel. Thereafter, Egon Oldendorff ordered the Master of the vessel to continue the voyage. When it was discovered that Triton had failed to abide by its agreement to prepay the Suez Canal toll, Egon Oldendorff transmitted the required fee enabling the vessel to enter the Red Sea. After Triton terminated operations in September, 1975, Egon Oldendorff made all decisions concerning continuation of the voyage by the vessel.

5. During the latter part of September until October 1, 1975, the vessel was at Port Sudan, but no cargo was discharged at Port Sudan. On October 3, 1975, the vessel arrived at Djibouti, and cargo was discharged there until October 16, 1975. Cargo was discharged at Djibouti despite the fact that none of the cargo aboard the vessel had originally been destined for Djibouti.

Between October 2 and 16, 1975, Egon Oldendorff advised the Plaintiff and the other shippers that their cargo would be discharged at a port other than that called for in the bill of lading unless the shippers tendered additional freight payment to Oldendorff. This demand was made by Oldendorff even though Plaintiff and the other shippers had paid for the shipment and prepaid bills of lading had been issued. Shippers paying the additional freight charge demanded by Oldendorff had their cargo delivered to the port specified in the bill of lading. Plaintiff refused to pay the additional contribution demanded by Oldendorff and insisted upon delivery of its wheat flour to Jeddah. During the October 2–16, 1975, period the Plaintiff's 30,000 bags of flour were discharged at Djibouti. The decision to discharge Plaintiff's cargo at Djibouti rather than Jeddah was made by Egon Oldendorff. On November 26, 1975, Oldendorff notified the Plaintiff that discharge at Djibouti was proper due to severe congestion at the port of Jeddah.

6. In July, 1975, discharge delays in Jeddah were 35 days. The port congestion at Jeddah increased through the remainder of 1975, with delays of 45 days in September and 70 days in October; by the end of the year congestion had increased to the point where berthing delays were over 100 days. Delays in discharge of cargo resulting in increased port congestion occur annually during the last quarter at all Arabian ports because of the period of Ramadan, a religious holiday season in Saudi Arabia; this annual condition is well known in the shipping industry.

Egon Oldendorff's vessel HINRICH OLDENDORFF was in Jeddah in August, 1975; thus, Oldendorff knew of the congestion at that time, as well as the expectations regarding conditions at the port for the remainder of 1975. The HINRICH OLDENDORFF discharged cargo at Jeddah in August, 1975, despite the conditions of congestion existing at that time.

During the fall religious holiday period, priority for discharge of foodstuffs was given to carriers by the Jeddah port authorities. Plaintiff made several shipments of flour to Jeddah on other carriers' vessels throughout the latter half of 1975.

7. After Oldendorff refused to pay the expenses of discharge and transshipment to be incurred in shipment of the 30,000 bags of flour from Djibouti to Jeddah, on November 21, 1975, Plaintiff remitted in advance $83,608.78 to Savon & Ries to have its cargo shipped to Jeddah. Savon & Ries shipped Plaintiff's cargo from Djibouti to

Jeddah in three separate parcels during January and February, 1976. Savon and Ries discharged the three separate parcels at Jeddah in an average of 14 days.

8. Clause 31 of the bill of lading in question authorizes discharge at another port where discharge at the designated port is threatened by severe congestion.

9. Egon Oldendorff was sued by the Plaintiff within one year of the discharge of the cargo at Djibouti. Up until March 16, 1978, Egon Oldendorff represented to the Plaintiff in response to discovery requests that he was the only party in interest; on this date Egon Oldendorff first contended that Arabella had full responsibility for the carriage of Plaintiff's cargo because of the alleged bareboat charter party entered into by Egon Oldendorff and Arabella. Upon learning of this contention, Plaintiff brought Arabella into this cause.

10. Plaintiff's cost of borrowing money for the period November 21, 1975—January 21, 1980, was a 9% rate of interest, the same as the statutory rate. Interest on $83,-608.78 for the period November 21, 1975—January 21, 1980 amounts to $31,394.96, calculated at a 9% interest rate.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this lawsuit and over both of the Defendants. Rule 9(h) F.R.Civ.P.; 28 U.S.C. § 1333.

■ 2. The relationship between Arabella and Oldendorff goes beyond a parent-subsidiary relationship. Oldendorff formed Arabella as a sham to hold title to vessels and to enter into charter party agreements. Arabella has no independent existence of its own. The actions and business decisions of Oldendorff following Triton's bankruptcy convince the Court that Oldendorff dominated and controlled Arabella's affairs. See, generally, *Cosmopolitan Co. v. McAllister*, 337 U.S. 783, 795, 69 S.Ct. 1317, 93 L.Ed. 1692 (1948). Plaintiff has overcome the presumption of corporate separateness, and the Court holds that Oldendorff and Arabella are equally responsible for contracts entered into by either entity. Arabella and Oldendorff were contractually obligated to deliver Plaintiff's cargo to Jeddah.

■ 3. The shipment contract was entered into by Plaintiff and Triton, the time charterer of the vessel. As part of the charter party agreement, Oldendorff authorized the charterer to sign bills of lading on his behalf. Triton's agent, Mercury Shipping Houston, signed and issued the bill of lading to the Plaintiff. Where a vessel owner authorizes a time charterer to issue bills of lading, any subsequent shipment contract becomes that of the ship, and the owner is bound by the terms of the bill of lading issued by the master. *Mondella v. S.S. Elie V*, 223 F.Supp. 390, 392 (S.D.N.Y. 1963). The terms of the bill of lading contract were breached when Plaintiff's cargo was discharged at Djibouti, and Oldendorff and Arabella are jointly and severally liable for the damages incurred by the Plaintiff as a result of the breach.

■ 4. The Carriage of Goods by Sea Act provides that ". . . deviation . . . for the purpose of loading and unloading cargo . . . shall, prima facie, be regarded as unreasonable." 46 U.S.C. § 1304(4). Oldendorff ordered the vessel to travel to Djibouti to unload the Plaintiff's and other shippers' cargo; thus, the deviation from the port designated in the bill of lading issued to the Plaintiff was for the sole purpose of unloading cargo. The burden of proving that the deviation was reasonable rests on the Defendants. *P & E Shipping v. Empressa Cubana Export*, 335 F.2d 678, 680 (1st Cir. 1964).

■ Egon Oldendorff made the business decision to discharge Plaintiff's cargo at Djibouti because it was less expensive than discharge at the bill of lading port would have been; furthermore, Oldendorff's decision to discharge the cargo at Djibouti was prompted by Plaintiff's refusal to make additional payment for what Oldendorff claims was an unexpected increase in shipment costs due to the congestion at Jeddah. This Court will not hold a contract to be

frustrated merely because of an increase in cost to one of the parties. Restatement of Contracts § 467 (1932).

■ A deviation for purposes of unloading cargo is regarded as being prima facie unreasonable for the following reasons:

".  .  . the carrier ought not to be allowed to deviate with no other motive than the increase of his own revenues .  .  . the proof required to overcome the prima facie unreasonableness of such a deviation would have to show something more than the mere reasonableness from the point of view of the carrier; most deviations of this sort are reasonable from his point of view, for they are performed, usually, in his interest. . ."

G. Gilmore & C. Black, *The Law of Admiralty*, p. 179 (2d ed. 1975). A reasonable carrier would have known of the congestion existing in Jeddah at the time the bill of lading was issued to Plaintiff. Also, Oldendorff should have been aware of the common knowledge in the shipping industry that congestion would be increasing during the latter part of 1975. Oldendorff had reason to know of the congestion at Jeddah; performance of this shipping contract was not impracticable. See Restatement (Second) of Contracts § 286(1) (Tentative Draft No. 9, 1974). The congestion existing at Jeddah on October 2, 1975, was not substantially greater than the delay in discharge that Defendant should have anticipated on July 7, 1975, the date the shipping contract was consummated. A carrier cannot invoke a liberties clause contained in a bill of lading where congestion at the time of discharge is not greater than that anticipated at the time the bill of lading was issued. *The Wildwood*, 133 F.2d 765, 771 (9th Cir.) cert. denied, 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943).

■ 5. Alternatively, Oldendorff is liable to the Plaintiff under the theory of intentional interference with the bill of lading contract. Plaintiff's cargo was discharged at Djibouti as a direct result of Egon Oldendorff's specific instructions to the vessel. A third party commits a tort against the shipper where he induces the carrier to breach a bill of lading contract in order to benefit himself. *Aljassim v. S.S. South Star*, 323 F.Supp. 918, 925 (S.D.N.Y. 1971); see, generally, 45 Am.Jur.2d, Interference, § 3.

■ 6. The Arabella-Oldendorff agreement of March 15, 1973, is not a bareboat charter agreement. A demise charter transfers possession and control of the vessel to the charterer with the owner retaining only a right of reversion following termination of the agreement. Retention of control of the vessel by the owner is inconsistent with a bareboat charter agreement, as the owner must relinquish total control of the vessel to the charterer under a bareboat charter agreement. *Romano v. West India Fruit*, 151 F.2d 727, 729 (5th Cir. 1945). A document requiring all important business and legal decisions to be approved by the owner is not a bareboat charter agreement. The control of the vessel exercised by Oldendorff following Triton's bankruptcy convinces the Court that a bareboat charter agreement between Oldendorff and Arabella did not exist.

■ 7. Plaintiff exercised reasonable diligence in seeking to discover the parties liable for the damages resulting from the breach of the shipment contract. Due to Oldendorff's concealment of its agreement with Arabella, the existence of Arabella's potential liability was not discovered by the Plaintiff until March 16, 1978. Fraudulent concealment of a cause of action by a defendant tolls the statute of limitations where the plaintiff has acted with reasonable diligence in attempting to discover against whom its claim lies. *Pan Am Petroleum Co. v. Orr*, 319 F.2d 612, 614 (5th Cir. 1963). The Court holds that the one year statute of limitations contained in the Carriage of Goods by Sea Act was tolled until March 16, 1978, and Plaintiff's suit against Arabella is not time barred.

■ 8. The carrier is liable for damages sustained by a shipper when a shipment contract is breached by an unreason-

able deviation, and the subsequent cost of shipment to the bill of lading port is an appropriate measure of damages. *Hellenic Lines v. United States*, 512 F.2d 1196, 1211 (2d Cir. 1975). Oldendorff and Arabella are jointly and severally liable to Plaintiff for the costs incurred by the Plaintiff in shipping the cargo from Djibouti to Jeddah, as well as the discharge expenses incurred by the Plaintiff.

9. Prejudgment interest, calculated at a rate equivalent to the Plaintiff's average cost of borrowing money from the date of loss to the date of judgment, is an appropriate award in admiralty cases. *Sabine Towing v. Zapata Ugland Drilling*, 553 F.2d 489, 490 (5th Cir. 1977).

10. Any finding of fact which is a conclusion of law is adopted as such, and any conclusion of law which is a finding of fact is adopted as such.

11. Oldendorff and Arabella are jointly and severally liable to the Plaintiff in the amount of $115,003.74.