**AVIN INTERNATIONAL BUNKERS SUPPLY, S.A., Plaintiff,**

v.

**WELLRUN MANAGEMENT, Wellrun Marine Transport S.A. Ltd., Wellrun Maritime S.A. Ltd., Wellrun Shipping Company, Ltd., Bailee Marine S.A., Kinyard Enterprise Co., Ltd., Fritz Steamship Corp. and Orient Leasing (ASIA) Ltd., Defendants.**

**BRIDGE OIL LIMITED, Plaintiff,**

v.

**WELLRUN MANAGEMENT INC. S.A., Wellrun Marine Transport S.A. Ltd., Wellrun Maritime S.A. Ltd., Wellrun Shipping Company, Ltd., Bailee Marine S.A., Kinyard Enterprise Co., Ltd., Fritz Steamship Corp. and Orient Leasing (ASIA) Ltd., Defendants.**

Nos. 84 Civ. 2591 (EW), 84 Civ. 7554 (EW).

United States District Court, S.D. New York.

May 3, 1985.

Nourse & Bowles, New York City, for plaintiffs Avin International Bunkers Supply S.A. and Bridge Oil Limited; Ruby H. Melton, John E. Bradley, New York City, of counsel.

Burlingham Underwood & Lord, New York City, for defendants Orient Leasing (Asia) Ltd. and Fritz Steamship Corp.; Robert J. Zapf, Lizabeth L. Burrell, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs, Avin International Bunkers Supply, S.A. ("Avin") and Bridge Oil Limited ("Bridge"), bring these consolidated actions to recover for payments allegedly due for fuel and diesel oil supplied to the M/V Bailee, a vessel owned by defendant, Fritz Steamship Corporation ("Fritz"), and its affiliate, Orient Leasing (Asia) Ltd. ("OLA").[1] OLA and Fritz move for summary judgment pursuant to Rule 56, Fed.R.Civ.P., claiming it is not they, but the bareboat charterers of the vessel, defendants Bailee Marine S.A. and its associated entities (collectively referred to as the "Wellrun Group"), who are responsible for any bunkers supplied to the M/V Bailee. In addition, defendants OLA and Fritz move to vacate an attachment of insurance proceeds arising from the loss of the vessel.

## BACKGROUND

On June 14, 1982, Fritz purchased the M/V Bailee with funds advanced from OLA, and simultaneously leased it for a term of 48 months to Bailee Marine pursuant to a "Bareboat Lease Agreement." The profitability of this lease arrangement was questionable from the start. Bailee Marine duly paid the first and second rent installments, but thereafter defaulted on its obligations, never making any full rental payments during the year and one half of the vessel's operation.

Bailee's default resulted in a series of financial actions by the parties to secure

---

1. Defendants OLA and Fritz concede they are "affiliated" companies and therefore they shall be treated as essentially one entity for the purposes of this motion.

their respective interests while maintaining the vessel in operation. In August of 1982, the Wellrun Group sought a one-year moratorium on its rental obligations. Although OLA and Fritz considered repossessing the vessel, they decided not to do so because of its limited scrap value and because its then operating revenues exceeded its costs. They agreed to renegotiate, but to secure its interest, and "[i]n order to resist arrest of the chartered ship[ ] by a third party,"[2] OLA placed an "in house" mortgage on the vessel by agreement with Fritz dated October 20, 1982.[3] Thereafter, Bailee only partially fulfilled the terms of the renegotiated contract, and a second renegotiation followed, pursuant to which Bailee made no payments at all.

During the course of renegotiations, Bailee Marine submitted to OLA budget information, voyage accountings, cargo bookings, and financial statements. Based on this information, OLA and Fritz became aware that Bailee was unable to pay for the vessel's supplies. Accordingly, OLA entered into an arrangement with Nordic Asia Limited ("Nordic"), which owned other vessels in the Wellrun Group that also were experiencing financial difficulties, whereby Nordic paid for the supplies by advancing necessary sums to Bailee Marine, in return for which Nordic collected the freights earned by the vessel.

Avin and Bridge allege that on October 4, 1983 and August 13, 1983, respectively, they furnished fuel to the M/V Bailee pursuant to contracts with the Wellrun Group. On November 22, 1983, the vessel sank. Plaintiffs now assert claims against OLA

and Fritz *in personam* for sums due on the contracts to supply fuel to the vessel, based on theories of express or implied contract, unjust enrichment, and estoppel.

## DISCUSSION

In support of their motion for summary judgment, defendants contend that plaintiffs must look to the bareboat charterer, Bailee Marine, for recovery of debts arising from supplies furnished to the vessel; that neither OLA nor Fritz contracted to purchase the fuel supplied by Avin or Bridge; and that they never took any actions or derived any unjust benefit which would entitle plaintiffs to equitable relief. In essence, defendants contend that the bareboat charter agreement with Bailee Marine insulates them from *in personam* liability. Plaintiffs respond that defendants' conduct was inconsistent with and impliedly modified the bareboat lease arrangement so that the relationship between Fritz and OLA, on the one hand, and Bailee, on the other, was at the time the fuel was supplied that of owner/operator, and not that of registered owner/bareboat charterer.

■ "It has long been the maritime law that the owners of a vessel are not personally liable for goods or services furnished to the vessel on order of a bare boat charterer of the vessel."[4] A bareboat charterer is the "owner *pro hac vice*" of the vessel, and as such bears all *in personam* liabilities arising out of the ship's operation.[5] "The vessel, so far as third persons are concerned, is his vessel."[6]

**2.** Plaintiffs' Exhibit 4, p. 5.

**3.** This mortgage was formally executed by Fritz and Orient Leasing (Antilles) N.V., not Orient Leasing (Asia) Ltd. ("OLA"). However, the parties have referred to it generally as OLA's mortgage, *see* Defendants' Reply Brief at 5, although defendants have also produced an affidavit disclaiming that OLA was in fact the mortgagee. Whether or not OLA is technically the mortgagee, the Court follows the defendants' own practice in referring to it as such.

**4.** *Pierside Terminal Operators, Inc. v. M/V Floridian,* 1974 A.M.C. 1954, 1954 (E.D.Va.1974).

**5.** *See Reed v. The Yaka,* 373 U.S. 410, 412–13, 83 S.Ct. 1349, 1351–52, 10 L.Ed.2d 448 (1963); *Guzman v. Pichirilo,* 369 U.S. 698, 699–700, 82 S.Ct. 1095, 1096–1097, 8 L.Ed.2d 205 (1962); *Fitzgerald v. A.L. Burbank & Co., Ltd.,* 451 F.2d 670, 676 (2d Cir.1971).

**6.** *Offshore Telephone Co. v. M/V Waterbuck,* 465 F.Supp. 1160, 1164 (E.D.La.1979) (quoting G. Gilmore & C. Black, The Law of Admiralty 218–19 (2d ed. 1975)).

■ The vital distinction between a bareboat charter (also termed a demise), and other charter parties, is the exclusive control of the vessel by the charterer. To create a bareboat charter or a demise of the vessel, the owner must completely and exclusively relinquish possession, command, and navigation to the demisee.[7] It is "tantamount to, though just short of, an outright transfer of ownership."[8]

■ In support of their motion, defendants rely primarily upon the charter itself. On its face and by its terms, the charter party is a bareboat lease of the vessel vesting control in Bailee Marine. It expressly provides that "[t]he Vessel shall during the Lease Period be in the full possession and at the disposal for all purposes of the Lessee and under its complete control in every respect"; and further, that the responsibility to victual, navigate, man, supply, fuel, repair, and provide insurance coverage for the vessel was Bailee's "at its own expense." However, the agreement by itself does not satisfy defendants' burden on this motion. The question whether a demise has been effected sufficient to insulate a registered owner from liability to third parties is a factual one which depends upon all the circumstances of the case, including not only the terms of the contract, but also the conduct of the parties under the arrangement.[9] The parties to a charter may not "by the choice of a label determine ... questions of responsibility to third persons."[10] While a "charter may describe the duties of the parties and provide for the shifting of risks between them ... in general, control entails responsibility...."[11]

■ Because a demise insulates a registered owner from liability vis-a-vis third parties, "the party attempting to show that the owner of the vessel has been relieved" of his legal obligations "must bear the heavy burden of establishing the facts which prove his point."[12] "We start ... with the general presumption that the owner does not mean to put his vessels into the possession of the charterer."[13] As the Supreme Court has stated:

[A]nything short of ... a complete transfer is a time or voyage charter party or not a charter party at all.... [A]ssuming ... a demise ... would isolate the owner from liability, the owner has the burden of showing such a charter. This burden is heavy, for courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship.[14]

To sustain their position, defendants, in addition to reliance upon the charter itself, also rely upon affidavits by directors of OLA and Fritz disclaiming any actual control over the M/V Bailee. In response, plaintiffs have submitted various documents evidencing the parties' conduct af-

7. *Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962); *accord Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc.*, 711 F.2d 110, 111 (8th Cir.1983); *Fitzgerald v. A.L. Burbank & Co., Ltd.*, 451 F.2d 670, 676 (2d Cir.1971); *Gaspard v. Diamond M. Drilling Co.*, 593 F.2d 605, 606 (5th Cir.1979).

8. *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962).

9. *See Hust v. Moore-McCormack Lines, Inc.*, 328 U.S. 707, 734, 66 S.Ct. 1218, 1231, 90 L.Ed. 1534 (1946) (Douglas, J., concurring); *United States v. Shea*, 152 U.S. 178, 190–91, 14 S.Ct. 519, 522–23, 38 L.Ed. 403 (1894); *see also Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc.*, 711 F.2d 110, 112 (8th Cir.1983); *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 498 & n. 8 (5th Cir.1982); *Ross Indus., Inc. v. M/V Gretke Oldendorff*, 483 F.Supp. 195, 198 (E.D.Tex.1980).

10. *Hust v. Moore-McCormack Lines, Inc.*, 328 U.S. 707, 736, 66 S.Ct. 1218, 1232, 90 L.Ed. 1534 (1946) (Douglas, J., concurring) ("The fact that the parties say it is the enterprise of one, not the other, is not decisive.")

11. *Agrico Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir.1982).

12. *Fitzgerald v. A.L. Burbank & Co., Ltd.*, 451 F.2d 670, 676 (2d Cir.1971) (quoting *Hansen v. E.I. DuPont de Nemours & Co.*, 33 F.2d 94, 96 (2d Cir.) *cert. denied*, 280 U.S. 589, 50 S.Ct. 37, 74 L.Ed. 638 (1929) (L. Hand, J.)).

13. *Id.*

14. *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1097, 8 L.Ed.2d 205 (1962).

ter the lease was signed which plaintiffs contend negate defendants' claim that they are not liable for the fuel furnished to the vessel. Among other matters, they contend substantial issues of fact are raised by documents produced thus far as to (1) the arrangements between OLA and Nordic to bunker the Bailee and other vessels in the Wellrun Group; (2) OLA's participation in the manning of the Bailee; (3) OLA's plan to replace Wellrun's crew with a crew of its own choosing; (4) OLA's payment of Bailee's crew claims; and (5) in general, OLA's involvement with the management and operation of the Bailee.

The documents offered by plaintiffs are sufficient to raise an issue of fact whether during the period when the vessel was operating, OLA and Fritz effectively relieved Bailee Marine of major financial responsibilities under the lease agreement. While Bailee Marine was responsible for making rental payments under the lease, neither OLA nor Fritz demanded full payment during the entire period of the vessel's operation. Moreover, while it was Bailee's responsibility to pay for the vessel's supplies "at its own expense," OLA arranged payment for supplies through the agreement with Nordic.

Plaintiffs assert these arrangements resulted in a substantial measure of supervision and effective control over the M/V Bailee's operations. For example, the agreement between OLA and Nordic, whereby Nordic was to advance sums for supplies and receive freights, provided that each advance was subject to OLA's consent. As OLA itself seems to concede in one document: "This is apparently an intervention in internal affairs."[15] Plaintiffs contend that as a result of this arrangement, whether the vessel had enough funds to maintain its day-to-day operations was dependent upon and subject to OLA's control, and that OLA effectively paid for the supplies since by allowing Nordic to recover freights, it subordinated its own right to them, given Bailee Marine's default.

Also it appears from the documents submitted in opposition to this motion that OLA and Fritz had plans to directly control operations by placing their own master on the M/V Bailee.[16] While unimplemented because the vessel was lost, it is argued that these plans indicate that OLA and Fritz viewed direct operation as the means to recoup its losses, rather than foreclosure and recharter of the vessel to another operator. Such an inference, in turn, would tend to support an interpretation of the prior activities of OLA and Fritz as attempts to assert some level of control over the operation of the M/V Bailee, as opposed to a "mere" arm's length financing relationship.

Drawing all inferences most favorable to the nonmovant, the Court finds that plaintiffs have raised issues of fact as to whether the parties' conduct was inconsistent with an exclusive transfer of control over the M/V Bailee and impliedly modified the prior bareboat lease agreement. Neither Fritz nor OLA are entitled to summary judgment on the ground that the bareboat lease agreement insulates them from liability.

However, defendants argue that even if plaintiffs have raised issues of fact concerning the charter arrangement, they are nevertheless entitled to summary judgment because plaintiffs have failed to raise an issue of fact that OLA and/or Fritz are liable, under an agency, quasi-contract or estoppel theory, for bunkers that concededly were ordered by neither Fritz nor OLA, but instead by Bailee Marine. While defendants are correct that plaintiffs must

---

**15.** Plaintiffs' Exhibit 4, p. 3; see Plaintiffs' Exhibit 13, p. 2; see also Ross Indus., Inc. v. M/V Gretke Oldendorff, 483 F.Supp. 195, 200 (E.D. Tex.1980) (while charter party purported to be a bareboat charter, its provision that the charterer was to obtain prior approval from the owner for all important business and legal decisions was inconsistent with a true demise).

**16.** Where the owner places his own crew on the vessel, it is extremely unlikely that there has been a true demise of the vessel. See Fitzgerald v. A.L. Burbank & Co., Ltd., 451 F.2d 670, 676 (2d Cir.1971).

show more than the lack of a true demise to warrant recovery from Fritz and/or OLA, summary disposition of plaintiffs' claims is inappropriate. It is evident that discovery thus far has altered plaintiffs' own view of the case, and has raised various questions as to the precise relationship of the parties, and in particular, as to the arrangement made with a third party, Nordic, to collect freights and disburse funds for supplies, which may bear upon defendants' liability.

Without passing upon the ultimate merits of plaintiffs' claims, the Court grants their motion, pursuant to Rule 56(f), Fed.R. Civ.P., for further party and nonparty discovery. Accordingly, defendants' motion for summary judgment is denied. In view of the Court's disposition, defendants' motion to vacate the attachment of insurance proceeds is also denied. All discovery is to be completed within twenty days from date.

So ordered.