The **BLOMMER CHOCOLATE COMPANY and Insurance Company of North America, Plaintiffs,**

v.

**NOSIRA SHARON LTD., Fednav Ltd.,** *in personam,* **and M/V NOSIRA SHARON, her engines, boilers, tackle, etc.,** *in rem,* **Defendants.**

No. 88 Civ. 7577 (BN).

United States District Court, S.D. New York.

Oct. 4, 1991.

Bigham, Englar, Jones & Houston, New York City (George R. Daly and Edward Kenny, of counsel), for plaintiffs.

Walker & Corsa, New York City (Christopher Mansuy, of counsel), for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District Court Judge by designation:

### INTRODUCTION

Blommer Chocolate Company ("Blommer"), the purchaser and consignee of a double-bagged sugar cargo transported on board the M/V NOSIRA SHARON from Antwerp, Belgium to Toledo, Ohio in April and early May of 1987, and the Insurance Company of North America ("INA"), Blommer's insurer, bring this action for dam-

ages under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 (1936), *et seq.* Plaintiffs allege improper care and custody of cargo, negligence and vessel unseaworthiness against Nosira Sharon Ltd., the vessel owner ("Nosira"), and Fednav Ltd., the voyage-charterer ("Fednav"), *in personam,* and the M/V NOSIRA SHARON, *in rem.*

Judgment is demanded in the amount of $50,000.00, plus interest and costs flowing out of three distinct categories of damages: (1) short-delivery of approximately 119,992 lbs. upon discharge in Toledo; (2) spillage of approximately 15,460 lbs. from punctured bags which leaked sugar during the unloading process; and (3) contamination of 165 bags or approximately 353,430 lbs. inasmuch as during offloading grain and other foreign matter was found between the sleeve separating the inner and outer bags.

Responding, defendants proffer objections concerning the existence of *in personam* jurisdiction over Fednav, and regarding the issue of privity of contract between Nosira and Blommer. Defendants make no objections to the existence of a maritime claim against the vessel, *in rem.*

Notwithstanding, defendants deny COGSA liability and seek dismissal of the instant complaint. In support of their request for dismissal of plaintiffs' claims, defendants initially focus upon plaintiffs' purported failure to sustain their burden of proving a shortage upon discharge. Next, defendants point to Blommer's improper method of stowage which allegedly became its responsibility by virtue of language in the charter party (*see* 46 U.S.C.App. § 1304(2)(i)). Last, defendants raise the theory that damages occured as a consequence of Blommers' insufficiency of packing (*see* 46 U.S.C.App. § 1304(2)(n)), coupled with failure to mitigate damages.

The following constitutes the Findings of Fact and Conclusions of Law of this court in accordance with Rule 52(a) Fed.R.Civ.P.:

## EVIDENTIARY ISSUE

Prior to addressing the merits of the action *sub judice* the court rules on the admissibility of a large portion of disputed exhibits offered at trial by plaintiffs regarding which decision was reserved pending review.

*Procedural History*

At the trial of this matter on April 16 and 17, 1991 [1] plaintiffs offered 75 exhibits, of which 46 were objected to by defendants. The determination respecting the admissibility of plaintiffs' submissions, however, required the court's extensive review of several lengthy deposition transcripts in conjunction with the disputed exhibits. Consequently decision was reserved, without objections, to provide the opportunity for a thorough digest of the relevant deposition transcripts.

*Rulings on Exhibits*

The following evidentiary rulings constitute the court's determination as to the 46 disputed exhibits offered by plaintiffs during the two day trial of this matter regarding which the court reserved decision pending further evaluation: *Admitted*—Exhibits 2, 4, 10–13(a), 14(b), 17(b), 18(a) & (b), 21, 22(a) & (b), 23, 26–28, 32, 34–48, 50, 52–54, 60–64; *Rejected*—Exhibits 22(c) & (d), 24, 56.

## JURISDICTION

Defendants seek dismissal of the complaint against Fednav, arguing that plaintiffs' failure to directly serve that defendant with a copy of the summons and complaint results in the court's lack of *in personam* jurisdiction over Fednav. Plaintiffs reply that Lamorte Burns & Co. Inc. ("Lamorte Burns") was acting as the "authorized agent of charterer, Fednav Ltd., and vessel and vessel owner in this matter, ... [and by] serving the Summons and Complaint, which included Fednav Ltd. in the caption, on Lamorte Burns & Company as agents of Nosira Sharon, Ltd., Fednav,

---

**1.** While this matter was tried in April, the court did not receive the parties' final post-trial submissions until June 21, 1991.

Ltd. was given the notice as due process requires" (pltfs' post-trial brief at 28).

Defendants' argument has merit. Under Rule 4(d)(3), Fed.R.Civ.P., service of process upon a domestic or foreign corporation shall be made as follows:

> [B]y delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process, and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.

Here, according to Rule 4(d)(3), Fednav, a foreign corporation organized and existing under the laws of Canada, was never properly served with a copy of the summons and complaint. Nevertheless, plaintiffs maintain that Lamorte Burns "was acting as the agents for Fednav Ltd. and other defendant [sic] in all matters concerning this claim. Authorization is clear from the deposition of Michael Minogue ... and plaintiffs' exhibits 35 through 45" (pltfs' post-trial brief at 29). But contrary to plaintiffs' assertions, neither the exhibits nor Minogue's testimony establish that Lamorte Burns qualifies as a "managing or general agent," or that it was "authorized by appointment or by law [on behalf of Fednav] to receive service of process."

True, Minogue's testimony demonstrated that he was a claims adjuster (Minogue depos. at 95); that, *inter alios*, Fednav authorized Lamorte Burns' representation (*Id.* at 21); and, that Lamorte Burns arranged for the making of surveys regarding certain portions of the cargo (*Id.* at 17). Other evidence also indicates that Lamorte Burns was only retained to adjust the sugar claim directly with cargo interests, with authorization to grant extensions of suit time (pltfs' exh. 35–41, 45).

█ Equally true, however, under these facts Fednav's retention of Lamorte Burns to represent Fednav along with other vessel interests in adjusting this claim falls far short of qualifying Lamorte Burns as a "managing or general agent." Usually, the managing or general agent for purposes of service of process is that person or entity undertaking those kinds of activities within the forum state which would justify the exercise of personal jurisdiction over the principal. *Grammenos v. Lemos,* 457 F.2d 1067, 1072 (2d Cir.1972); *Bomze v. Nardis Sportswear, Inc.,* 165 F.2d 33, 37 (2d Cir.1948).

More specifically, the activities must amount to a "regular and continuous course of substantial business ... [calling] for the exercise of discretion by [the agent] ... in carrying out its duties [on Charterer's behalf] ... suggest[ing] a certain identity and closeness between the two entities." *Koupetoris v. Konkar Intrepid Corp.,* 535 F.2d 1392, 1395–96 (2d Cir.1976). Under these criteria, it would be completely improper to depict Lamorte Burns' activities on Fednav's behalf as indicative of the types of qualities characterizing a "managing or general" agent.

Furthermore, the record is silent concerning any specific appointment by Fednav which authorized Lamorte Burns to accept service of process or, more importantly, any such acceptance of service by Lamorte Burns on Fednav's behalf. To reiterate, plaintiffs contend that the presence of Fednav's name and address within the caption of the summons combined with the fact that proof of service upon Lamorte Burns (Fednav's purported agent) was established, provided Fednav with proper notice and satisfied the requirements of due process.

Plaintiffs' theory is rejected for the reason that it presupposes, without proof, that Lamorte Burns was authorized to receive service of process on Fednav's behalf. Although there is no doubt that the summons refers to Nosira Shipping Ltd.[2] and Fednav in the caption, and there is evidence estab-

---

**2.** The summons, complaint and answer in this action name "NOSIRA *SHIPPING* LTD." as one of the defendants. Pleadings filed later, however, have uniformly substituted "NOSIRA *SHARON* LTD." as one of the named defendants. Since the parties have raised no objections to this obvious discrepancy, the court assumes that both descriptions refer to the same defendant.

lishing proof of service upon Lamorte Burns respecting Nosira Shipping Ltd., the missing link which uncouples plaintiffs' conclusory argument is the lack of *any* evidence confirming the agency relationship between Fednav and Lamorte Burns with regard to service of process. Without proof of such an agency relationship, the court finds in favor of defendants on this issue.

Accordingly after further evaluation, the court reverses its trial ruling denying defendants' motion and now dismisses the complaint as to Fednav.

## PRIVITY OF CONTRACT

Much less persuasive is defendants' next assertion that privity of contract between Nosira and Blommer does not exist. Defendants premise their argument on the belief that the record lacks evidence showing Nosira to be a party subject to the bill of lading (defts' post-trial brief at 8).

■ The pertinent rule of law establishes that a vessel owner becomes a party to the bill of lading when the vessel owner, through the master, grants authority to the charterer or to charterer's agent to sign on the vessel owner's behalf. This characterizes the shipowner as a "carrier," subject to *in personam* liability within the scope of COGSA. *See Demsey & Assoc., Inc. v. S.S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir.1972); *Gans S.S. Line v. Wilhelmsen*, 275 Fed. 254, 262 (2d Cir.1921) (*"The Themis"*). If, on the other hand, the bill of lading is signed by the master, but without the shipowner's authorization, the vessel owner may not be personally bound by COGSA. *Demsey & Assoc., Inc.*, 461 F.2d at 1015.

■ Defendants obtain no support from the above stated rule. Nosira's authority over the master of the M/V NOSIRA SHARON was never compromised because Nosira never divested itself of all control and command of the vessel under a "bareboat" or "demise" charter, and only a true demise charter releases a vessel owner of legal liability. *See Guzman v. Pichirilo*, 369 U.S. 698, 699–700, 82 S.Ct. 1095, 1096–

97, 8 L.Ed.2d 205 (1962); *Avin Int'l Bunkers Supply, S.A. v. Wellrun Management*, 607 F.Supp. 738 (S.D.N.Y.1985). Indeed, Nosira stipulated at trial that the alleged "demisee," Caribbean Trailer Ships, is a wholly owned subsidiary of Nosira (Tr. 132); there is thus little, if any, doubt that Nosira retained significant control, command and possession of the vessel.

While the issue of control and command of the vessel is substantially reinforced by defendants' stipulation, the determination of whether or not Nosira successfully insulated itself from liability by means of its agreement with Caribbean Trailer Ships is a question of fact, ultimately resolved by looking to the language of the charter party itself.

At first glance, the charter party between Nosira and Caribbean Trailer Ships Limited ("Caribbean Trailer Ships") appears to be a demise charter (defts' exh. O). For example, there is the prominent preprinted heading stating in relevant part "Standard Bareboat Charter," and the presence of the following language "[t]he vessel shall during the charter period be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect."

Despite the seeming force of such language, however, the agreement as a whole, offered by Nosira as proof of a demise charter between Nosira and Caribbean Trailer Ships, fails to sustain Nosira's required burden of demonstrating its complete divestiture of control or possession. *See Guzman*, 369 U.S. at 700, 82 S.Ct. at 1096; *Avin Int'l Bunkers Supply*, 607 F.Supp. at 741. To begin with, other highly important terms in the charter, *viz*, "time for delivery" and "charter hire" were left "to be agreed," and the term "charter period" was, at the very least, unclear since it was terminable at any time, without cause, by either party with merely one month's notice. Next, a significant proportion of other clauses were completely redacted or otherwise altered, thereby rendering extremely suspect the purported "standard bareboat" nature of this charter.

Both factors, the vague or incomplete clauses, and the numerous redactions or alterations of other language, contribute to the court's finding that the agreement between Nosira and Caribbean Trailer Ships was not a "true" demise charter, and hence, Nosira could be subject to *in personam* liability assuming the master authorized the signing of the bill of lading.

It is clear that the remaining link was accordingly established. An express grant of authority from the master to Cobelfret N.V., Fednav's European general agents ("Cobelfret"), to act as agent for the master and sign the bill of lading on the master's behalf was plainly admitted as part of defendants' response to question 1(a) of plaintiffs' October 1989 request for admissions (pltfs' exh. 71). Defendants are now conclusively bound by that admission. *See* Rule 36(b) Fed.R.Civ.P.

More, language appearing on the face of the bill of lading itself supports this admission. Imprinted above Cobelfret's signature is the following statement:

### COBELFRET

### Compagnia Belge d'Affrettementa n.v.

### as agents

### Signed as per authority of the Master

In sum: Since the record contains sufficient evidence that Nosira, through the master, expressly authorized Cobelfret, Fednav's agent, to sign the bill of lading, plaintiffs' claim against Nosira remains alive.

### DISCUSSION

The court turns to the controversy surrounding the damage to the subject cargo of bagged sugar. On April 16, 1986 Blommer contracted with E.D. & F. Man (Sugar) Ltd. ("E.D. & F. Man") for the purchase of 8,000 metric tons of sugar (pltfs' exh. 1). In furtherance of the sugar contract during March, 1987, a shipment was readied approximating 4,000 metric tons of sugar packed within 4,120 double-lined bags, one inner and one outer, with a tied loop at the top into which a hook could be inserted to facilitate manipulation of the stow. The cargo was purchased for $921,000 under a letter of credit issued from Continental Illinois National Bank and Trust Company of Chicago ("Continental Bank"), and drawn upon by Blommer on April 16, 1987 (pltfs' exh. 27).

Blommer arranged for transport of the bagged sugar to Toledo by entering into a voyage-charter with Fedcom ("Fedcom/Blommer charter party"), a division of Fednav, whereby Blommer obtained space onboard the M/V NOSIRA SHARON. Fednav had previously time-chartered the M/V NOSIRA SHARON from Forestships International Ltd. ("Forestships"), which was itself a time-charterer pursuant to a charter with Caribbean Trailer Ships, the wholly owned subsidiary of Nosira, the vessel owner.

Between March 30 and April 3 stevedores retained by Blommer, but under the master's supervision, loaded holds 2 and 6 of the M/V NOSIRA SHARON with the 4,120 bags of sugar (pltfs' exh. 19(d), defts' exh. A). Contemporaneously, on March 31, Fednav issued a bill of lading marked "CLEAN ON BOARD" and signed by Cobelfret as agents for the master (pltfs' exh. 25), with the following description of the sugar cargo, particularized by E.D. & F. Man:

4.000 METRIC TONS WHITE REFINED SUGAR OF EEC NO. 2 QUALITY WITH MINIMUM POLARIZATION 99.8 DEGREES AND MAXIMUM MOISTURE 0.06 PERCENT AT TIME OF SHIPMENT AND MAXIMUM COLOR 65 ICUMSA UNITS IN BAGS ABOUT ONE METRIC TON EACH.
4.000.000 KG NETT
4.120 BAGS (BIG BAGS)

In accordance with the Fedcom/Blommer charter party, the freight due for cargo transport was "$42.00 per metric ton freein/liner terms, all inclusive, discharge" (defts' exh. A). Thus, the total freight payable was $168,000. Payment of ninety percent (90%) less two and one-half percent (2.5%) commission on the net ocean freight was due within seven days after Fednav's release of the signed "clean" bill of lading

to Blommer. The remaining ten percent (10%) was due upon "right and true delivery of the cargo." A signed "clean" bill of lading was, in fact, released on April 4 (pltfs' exh. 15) following which Blommer paid Fednav the freight due: $147,269 on April 10, and the remaining balance of $16,800 on June 19 after discharge in Toledo (pltfs' exh. 15, 16).

*Applicability of COGSA*

It is fundamental that "every bill of lading or similar document of title *which is evidence of a contract for the carriage of goods by sea* to or from ports of the United States, in foreign trade" is subject to COGSA. 46 U.S.C.App. §§ 1300, 1312 (italics supplied). And assuming COGSA attaches, in compliance with §§ 1301(e) and 1303(2) responsibility for stowage and handling of cargo from the time when it is loaded onboard to the time when it is discharged rests with the carrier, that § 1301(a) defines as "the owner or the charterer who enters into a contract of carriage with the shipper."

In view of the fact that the transport of this sugar cargo was arranged under a charter party expressly incorporated into the bill of lading, the dispute herein hinges upon the applicability of the charter party's provisions considering the regulatory scheme under COGSA. The specific dilemma arises from the following language in COGSA § 1305, "the provisions of ... [COGSA] shall not be applicable to charter parties; but if bills of lading are issued ... under a charter party, they shall comply with the terms of [COGSA]."

This statutory paradox has frequently been clarified by reference to a dichotomy distinguishing solely between the private and public carriage of goods:

> In cases of *private carriage* where the cargo owner and vessel owner [or charterer] have entered into a ... charter party, any bill of lading issued serves *only as a receipt of cargo* and, when in negotiable form, as an indicia of title ... [the bill of lading's] provisions ... are not contractual, the contract of carriage being the charter party alone.... [Conversely,] *when the charterer puts the vessel on berth as a general ship* and issues bills of lading ... the provisions of the charter party are not binding on the cargo owner ... the bills of lading alone *are the contracts of carriage.*

2A *Benedict on Admiralty* § 34, 4–13 (7th ed. 1985) (emphasis supplied).

Guided by this reasoning, plaintiffs contend, under the Fedcom/Blommer charter party since the shipper required only a portion of the available space on the M/V NOSIRA SHARON, the vessel must have been engaged for common or public carriage instead of private carriage of goods, and, as a result, the carrier's liabilities and immunities are to be gleaned from COGSA. Moreover, they conclude, only those terms in the charter party which reduce the carrier's rights or increase carrier's liabilities should be included in the contract of carriage. *See* 46 U.S.C.App. § 1305.

The Second Circuit has held that the decision as to whether or not to apply the law of COGSA to a contract of carriage does not depend *solely* on the public/private carriage of goods distinction. *Nichimen Co. v. M/V Farland,* 462 F.2d 319, 328 (2d Cir.1972). Indeed, it is the "nature of the parties' agreement with respect to bills of lading [which] may effectively dictate the applicability of COGSA even though the carriage is of a private nature under a charter party." *Id.*

In the instant matter, the litigants share the understanding that their rights and liabilities under their agreement are governed by COGSA (Tr. 5–6). Still, defendants insist that the terms of the charter party establish Blommer's responsibility for cargo stowage, and that this burden is not inconsistent with COGSA. Specifically, they suggest: "pursuant to the terms and provisions of the charter and bill of lading Blommer undertook the obligation to load the bags of sugar aboard the M/V NOSIRA SHARON at Antwerp free of risk and expense to the vessel" (defts' post-trial concl. of law at 1); thus Blommer bears responsibility for any consequences of improper stowage. Surprisingly, defendants conclude that such a risk allocation is consistent with COGSA § 1303(8) which gener-

ally proscribes a carrier from circumscribing its COGSA duty to load, handle and discharge cargo by lessening liability through exculpatory language in the contract of carriage.

The short of the matter: since there is no dispute that COGSA applies, any private agreements under the Fedcom/Blommer voyage-charter which are inconsistent with COGSA must be stricken as "null and void and of no effect." *See* 46 U.S.C.App. § 1303(8). And without question, any acceptance of defendants' interpretation of those clauses pertaining to risk and responsibility for proper stowage, notably clauses six (6) and fourteen (14), most certainly conflicts with COGSA § 1303(8) which, by reference, incorporates the carrier's duty to "properly and carefully load, handle, keep, care for, and discharge the goods carried" under § 1303(2).

■ Assuming *arguendo*, the court chose not to reject defendants' theory based solely upon the obvious conflict with regard to § 1303(8), another weakness in defendants' argument becomes evident upon scrutiny of the relevant language of the charter party itself. Under clause fourteen (14), the charter party states: "stevedores *shall* be considered *Owner's* servants, and the Charterers/Shippers/Receivers are not to be responsible for any negligence of *whatsoever* nature, default or error in judgment of the stevedores employed" (emphasis supplied).

Additionally, clause six (6) speaks only to the ship's freedom from "risk and expense" for stowage of cargo during the time period when it is "to be brought to [the vessel] and [upon arrival] taken from alongside," not during *actual transport* from Antwerp to Toledo when, as COGSA mandates, the carrier assumes liability for the care and custody of cargo.

Therefore, in accordance with the very language appearing in the Fedcom/Blommer charter party, the carrier was responsible for the disposition of cargo during transport, just as directed under the aforementioned provisions of COGSA.

*Prima Facie Case*

■ Section 1303(3) & (4) of COGSA qualify a bill of lading containing the listed weight and apparent condition of the cargo as *prima facie* evidence of the carrier's receipt of the goods as described. *See Spanish Am. Skin Co. v. The Ferngulf,* 242 F.2d 551, 553 (2d Cir.1957). Put otherwise, such a "clean" bill of lading creates a rebuttable presumption that the goods were delivered to the carrier in good condition. *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1227 (11th Cir.1983).

■ Significantly, here, the evidence demonstrates that Blommer wired payment for the ocean freight following Fednav's release of a "clean" bill of lading (pltfs' exh. 15). More, the mate's receipt documented that 4,013,102 kgs [gross] was received "clean on board" (defts' exh. B). True, the mate's receipt contained a handwritten notation listing the weight as unknown, but this fact is more than overcome by the hatch loading report signed by the master which also tallied "clean on board" 4,013,102 kgs. [gross]. Finally, Belgian correspondents of S.G.S. Switzerland ("SGS Van Bree N.V."), which issued a certificate of inspection for and on behalf of Blommer, estimated a weight of 4,000 metric tons "at time of shipment on the basis of a reasonable percentage of bags selected at random" (pltfs' exh. 11(a)).

The court determines that the issuance of a "clean" bill of lading which preconditioned payment of the ocean freight, the mate's receipt and hatch loading report, and the SGS Van Bree N.V. inspection report, *convincingly* establish that the cargo loaded was 4,000 metric tons of sugar in 4,120 bags, in apparent good order and condition. *See Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982). Concomitantly, carrier's attempt to dispute the weight and number of bags by relying on pre-printed language on the face of the bill fails (defts' post-trial reply brief at 3–4). *See Spanish Am. Skin Co.,* 242 F.2d at 553–54.

In any event, defendants' theory of contract construction conflicts with the Congressional intent promulgating the enact-

ment of COGSA which was aimed at promoting uniformity and simplicity. Without doubt, the goal was to relieve shippers, like Blommer, from the requirement of scrutinizing all bills of lading for exceptions contained therein when determining the scope of shipper's rights and responsibilities.[3]

Shortly after embarking from Antwerp, the vessel encountered Beaufort Force 5/6 winds[4], which according to the Master's deck log book, resulted in the vessel's "rolling heavily at times to a short steep swell ... [and later] ... rolling very heavily." The effect of the rough weather caused shifting of stow, necessitating course deviation to Belfast, Ireland to repack certain other portions of the cargo on board (pltfs' exh. 65).

Subsequently, on May 4, the M/V NOSIRA SHARON arrived in Toledo and commenced unloading. At that time John M. Uzmann and Robin D. Champness were hired as surveyors by plaintiffs and defendants, respectively, to prepare reports documenting the unloading process.

Both surveyors reported that the sugar cargo had experienced damage, i.e., tearage and spillage, during transport (pltfs' exh. 59, defts' exh. F). Uzmann credibly recollected arriving at the unloading terminal on May 4 before cargo was offloaded, and that he witnessed the entire three-day unloading process through May 6. Upon entering the cargo holds, he observed that the "bulk bags were stacked upon each other and in a fairly *tight* stow and down in each cargo hold" (Tr. 31; emphasis supplied). The cargo was protected by plywood sheeting around the exterior to insulate the bags from the structural members of the hold, and 2–by–4 wooden planks or "dunnage" were wedged in between the stacks and levels of sugar. Some of the

bulk bags had crushed the plywood along side the cargo hold bulkheads and the supporting dunnage, resulting in punctures to the bags caused by plywood splinters and broken planks (Tr. 31).

Additionally, Uzmann stated that he detected grain and loose rust scales on horizontal structural members near the top of the hatch underneath the deck of the vessel (Tr. 31). This debris, some remnants from a previous cargo, had shaken down from the overhead of the cargo holds and became lodged along the sides of 165 bags between the inner polyethylene liner and the outer canvas sleeve (Tr. 42–50; pltfs' exh. 58, 59).

Champness corroborated Uzmann's testimony to the extent that he, too, noticed bags with varying degrees of infiltration between the linings, and bags which had burst through the plywood sheeting separating the sugar cargo from the support members (Tr. 136; defts' exh. F).

Additionally, Brian Wagoner ("Wagoner"), plant manager for Arbor Foods, Incorporated ("Arbor Foods"), which unloaded the sugar and stored it in Arbor's warehouse for Blommer's future usage, bolstered Uzmann's and Champness' accounts regarding the damages to the cargo noted upon discharge (Wagoner depos. at 9–16, 22–23; pltfs' exh. 60).

As well settled under COGSA, plaintiffs establish their *prima facie* case by proving that a clean bill of lading was issued for 4,000 m.t. packed in 4,120 bags in good order and condition, and that the M/V NOSIRA SHARON delivered a portion of the bagged sugar in a damaged state. *Insurance Co. of N. Am. v. S.S. "Globe Nova"*, 820 F.2d 546, 548 (2d Cir.1987); *Spencer Kellogg, Division of Textron, Inc. v. S.S.*

3. *See* Hearings before House Committee on Merchant Marine and Fisheries on the bill S1152, 74th Congress, 2d Session at p. 29, and House Committee Report No. 2217 on the bill S1152, 74th Congress, which became the Carriage of Goods by Sea Act.

4. The Beaufort Wind Scale is a widely accepted method utilized to classify the effect of weather conditions on ocean and land. The effect of Beaufort Force 5 on the ocean is characterized

by "[m]oderate waves, taking longer form; many whitecaps; some spray." The wind speed ranges from 19–24 mph and qualifies as a "fresh breeze." A determination of Beaufort Force 6 is indicative of "[l]arger waves forming; whitecaps everywhere; more spray." As a result, wind speeds increase to 25–31 mph and are depicted by the label "strong breeze." Bowditch, *American Practical Navigator*, vol. 1, p. 1267 (1977).

**770**

"*Mormacsea*", 703 F.2d. 44, 46 (2d Cir. 1983); *Demsey & Assoc., Inc,* 461 F.2d at 1014 (citations omitted).

■ To overcome plaintiffs' *prima facie* showing, then, the remaining defendants Nosira, *in personam,* and the M/V NOSIRA SHARON *in rem,* must demonstrate that any loss of or damage to the sugar cargo during transit was not due to their negligence, or establish that their acts or omissions fall within one of the "excepted causes" listed in COGSA § 1304, thereby excusing liability. *Insurance Co. of North America,* 820 F.2d at 548 (*citing Westway Coffee Corp.,* 675 F.2d at 32); *Demsey & Assoc., Inc.,* 461 F.2d at 1015 (citations omitted).

■ Finally, if the defendants succeed in rebutting the plaintiffs' *prima facie* case, the burden shifts back to the plaintiffs to demonstrate that the defendants' negligence was a contributing factor to the damage. *United States v. Lykes Bros. S.S. Co.,* 511 F.2d 218, 224 (5th Cir.1975).

*Damages Claims*

1. Short Delivery of 119,992 lbs.

The bagged sugar was weighed by Arbor Foods, under Wagoner's supervision, at the port of discharge in Toledo (Wagoner depos. at 53–66), and the shipment was processed for Arbor Foods by Andrea Irving ("Irving"), the Customs manager since 1984. Irving purportedly assisted in calculating the shortage and prepared the U.S. Customs Service documentation required for submission whenever a shipment enters a "free trade" (duty free) zone such as the port of discharge in Toledo (Irving depos. at 7–8, 13).

According to Wagoner and Irving, the weighing process consisted of placing three to four bags on either of two types of pallets, American and Canadian, in wagons which were pulled by jeeps. They also explained that, for purposes of calculation, the weight of the jeep, wagon and the driver, which remained the same for each

jeep, signified the "tare weight." The cargo rested on a total of 4,117 Canadian and American pallets weighing between 75–80 and 45–50 lbs., respectively. Nevertheless, in determining the total weight of the shipment, Arbor Foods utilized an *average* pallet weight of 64 lbs. The 4,120 bags were factored in at 8 lbs. each (Wagoner depos. at 58, 61; Irving depos. at 18).

Using the Westway Trading Company scales ("Westway scales") near the Arbor Foods warehouse, Westway weight tickets were prepared which collectively contained a tally of the cargo's weight (defts' exh. J). The total was purportedly calculated by subtracting from the gross weight of the shipment the tare weights, the weight of 4,117 pallets and the weight of the 4,120 bags themselves (Wagoner depos. at 11–12).

Withal, plaintiffs assert that the net weight of the cargo after discharge and weighing equals 8,698,408 lbs (3,945.57 m.t.) representing a net shortage of 119,992 lbs. from the manifested shipment weight of 8,818,400 lbs. (4,000 m.t.) (Wagoner depos. at 12; pltfs' exh. 59). Thus, to comply with free trade zone regulations, on June 22, 1987 Arbor Foods filed a Discrepancy Report and Declaration notifying the U.S. Customs Service of the purported total shortage [5].

Plaintiffs suggest the damages from the short-delivery of 119,992 lbs. may be broken down into two types: (1) 113,392 lbs. straight short-shipment and (2) 6,600 lbs. representing three bags which could not be offloaded during discharge (Tr. 9). Apparently, during the voyage a rope loop on the top of three bags had rotated down against the skin of the vessel so that the loops were not accessible, making it impossible for the bags to be extracted from the holds (Wagoner depos. at 72; pltfs' exh. 59; Tr. 82). The court addresses these alleged short-delivery claims seriatim.

(1)

■ In regard to the 113,392 lbs., the court finds no credible evidence supporting

---

**5.** The report stated that the total amount of cargo not delivered allegedly amounted to 119,-999 lbs, (pltfs' exh. 62), subdivided into two

types: 113,579 lbs. representing cargo short-delivered, and 6,420 lbs. consisting of three bags which could not be extracted from the holds.

Wagoner's and Irving's conclusory testimony which merely served to summarize the method utilized to calculate the shortage. Even though Wagoner provided the weight tickets Westway generated and tallied, the record indicates that neither Wagoner nor Irving produced Arbor Food's alleged independent calculations (Wagoner depos. at 56–57; Irving depos. at 18).

Consequently, defendants correctly argue, plaintiffs shortage calculation is unreliable and cannot support their conclusion. Indeed, after tallying the figures from the same Westway weight ticket figures defendants' surveyor, Champness, arrived at a contrary total gross weight of 9,076,760 lbs. (Tr. 162). From that figure Champness subtracted the weight of 4,117 bags [6] (@ 8 lbs./bag) totalling 32,936 lbs., to yield a weight of sugar and pallets of 9,043,824 lbs. (Tr. 165–66).

Concerning pallets, defendants contend that different weights apply depending on which type of pallet is considered, Canadian or American, so that a total of 1,005 Canadian and 3,115 American pallets were necessary to support this sugar cargo (defts, exh. L). Defendants suggest, then, at 75 lbs. each the Canadian pallets weighed 75,450 lbs., and at an average weight of 48 lbs. the American pallets weighed 149,520 lbs for a total pallet weight of 224,970 lbs. Deducting that figure from the total of 9,043,824 lbs., the result is 8,818,854 lbs.

which when divided by 2,204.6 lbs per metric ton (Tr. 169), yields 4,000.16 metric tons as the net shipment weight after discharge (defts' post-trial brief at 4).

After performing its own independent analysis the court accepts, with a slight modification, defendants calculations, and determines there is no credible evidence which supports plaintiffs request for monetary damages based on an alleged short-delivery amounting to 133,392 lbs.

The court reaches this conclusion based on the following methodology: Commencing with verification of the source Westway weight tickets, the individual weights listed consisted of the weight of the sugar, bags, pallets, wagons and jeeps. The weight of the wagons, jeeps and drivers comprises the "tare" weight which is subtracted from the gross weight. Once the tare weight is subtracted, the weight of the bags and pallets is also deducted leaving the net weight of the sugar. The tare weight varied depending on which of the nine (9) jeeps pulling wagons, or two (2) flat bed trucks, was utilized for hauling. Therefore the weight tickets were segregated into eleven (11) groups and a tally was prepared corresponding to the number of weight entries for each vehicle.

The following calculations comprise the court's findings based on figures appearing on the Westway weight tickets:

Jeep # 1:
Tare weight = 5920 lbs.
Weights = 117
Less:
Net (including bags and pallets) =

Gross weight = 1,717,760 lbs.
Total tare weight = 692,640 lbs.
1,025,120 lbs.

Jeep # 2:
Tare weight = 6460 lbs.
Weights = 72
Less:
Net (including bags and pallets) =

Gross weight = 1,086,540 lbs.
Total tare weight = 465,120 lbs.
621,420 lbs.

Jeep # 3:
Tare weight = 5770 lbs.
Weights = 121
Less:
Net (including bags and pallets) =

Gross weight = 1,762,340 lbs.
Total tare weight = 698,170 lbs.
1,064,170 lbs.

6. Champness recalled that the bill of lading manifested 4,120 bags and three were unable to be offloaded leaving 4,117 bags which were actually discharged (Tr. 166–67).

Jeep # 4:  Gross weight = 1,680,680 lbs.
 Tare weight = 6100 lbs.
 Weights = 114
  Less:  Total tare weight = 695,400 lbs.
 Net (including bags and pallets) = 985,280 lbs.

Jeep # 7:  Gross weight = 1,772,920 lbs.
 Tare weight = 5520 lbs.
 Weights = 124
  Less:  Total tare weight = 684,480 lbs.
 Net (including bags and pallets) = 1,088,440 lbs.

Jeep # 9:  Gross weight = 1,712,780 lbs.
 Tare weight = 5780 lbs.
 Weights = 118
  Less:  Total tare weight = 682,040 lbs.
 Net (including bags and pallets) = 1,030,740 lbs.

Jeep # 10:  Gross weight = 1,696,460 lbs.
 Tare weight = 5760 lbs.
 Weights = 118
  Less:  Total tare weight = 679,680 lbs.
 Net (including bags and pallets) = 1,016,780 lbs.

Jeep # 15:  Gross weight = 1,960,340 lbs.
 Tare weight = 7720 lbs.
 Weights = 120
  Less:  Total tare weight = 926,400 lbs.
 Net (including bags and pallets) = 1,033,940 lbs.

Jeep # 20:  Gross weight = 1,967,460 lbs.
 Tare weight = 7550 lbs.
 Weights = 121
  Less:  Total tare weight = 913,550 lbs.
 Net (including bags and pallets) = 1,053,910 lbs.

Truck # 18973 (flatbed) 2 net weights × 39,100 lbs: 78,200 lbs.
Truck # 18982 (flatbed) 2 net weights × 39,380 lbs: 78,760 lbs.

---

The resulting net weight of all sugar unloaded including pallets and bags but less tare weight amounts to a sum of 9,076,760 lbs. Obviously, to arrive at the true net weight the court accounts for the deduction of pallets and bags. Both parties agree and the court accepts that the weight of each bag is 8 lbs., but since the Canadian pallets weighed between 75–80 lbs. a truer total than defendants is reached by utilizing an average weight of 77.5 lbs. Similarly, each American pallet was listed at 45–50 lbs. resulting in an average of 47.5 lbs.

The sum total weight of the 4,120 bags @ 8lb/bag is 32,950 lbs. The Canadian pallets, derived by multiplying 77.5 lbs. × 1,005 pallets comprise 77,887.5 lbs., and the American pallets, similarly calculated by multiplying 47.5 lbs. × 3,115 amount to 147,962.5 lbs. A correction factor is necessary since three bags remained onboard the vessel after discharge, however, so the actual total bag weight becomes 32,936 lbs. As for pallets, since over three times as many American pallets were utilized, the court subtracts the weight of two American pallets and one Canadian to arrive at a final pallet weight of 225,667.5 lbs. The resulting total for pallets and bags is thus 258,603.5 lbs. Subtracting the pallet and bag figures from the net total less the tare

weight leaves 8,818,146.5 lbs., which amount when divided by the conversion figure of 2,204.6 lbs/m.t. equals a net sugar delivery weight of 3,999.88 m.t. or approximately 4,000 m.t.

Simply put, then, although plaintiffs established the presence of 4,000 m.t. of sugar in good order and condition at the load port, plaintiff's allegation that 113,392 lbs. of cargo was not delivered, overwhelmingly based on the unsupported testimony of Wagoner and Irving, is plainly contradicted by defendants' tabulations which the court independently verified relying upon the only credible evidence in the record, i.e., the source Westway weight tickets. As a result, plaintiffs are not entitled to any recovery for the 113,392 lbs. portion of their short-delivery claim.

### (2)

The second component in plaintiffs' short-shipment claim concerns the liability of the remaining defendants, Nosira, *in personam*, and the M/V NOSIRA SHARON, *in rem*, for damages arising from non-delivery of approximately 6,600 lbs. contained in three bags which, indisputably, were not discharged from the vessel in Toledo (Tr. 82, 157).

The facts already establish that Nosira qualifies as a COGSA "carrier," and thus bears responsibility for stowage and handling of the cargo for the duration of Nosira's custody, i.e., from the time when the stow was loaded onboard to the time it was discharged from the vessel. *See* COGSA §§ 1301(e), 1303(2). Since Nosira's liability for not performing its duty of delivering the three bags falls within the scope of COGSA, the sole remaining question is whether Nosira may relieve itself from liability by resorting to one of the § 1304 "excepted causes."

The answer is in the negative. In fact, defendants have completely failed to raise any credible defense to rebut plaintiffs' *prima facie* case regarding this portion of the alleged short-delivery. Instead, defendants cling to their hypothesis that under the terms of the Fedcom/Blommer charter party Blommer undertook responsibility for the care and custody of the cargo during transport, and therefore, in accordance with § 1304(2)(i) the carrier may absolve itself of liability for the "acts and omissions of the shipper or owner of the goods, their agents or representatives." But since the court previously rejected defendants' theory outright, as contrary to the statutory scheme under COGSA as well as the language of the charter party itself, it rules in favor of plaintiffs as to this portion of their short-shipment claim.

Although plaintiffs request for damages is founded upon a purported loss of 6600 lbs., after reviewing the evidence the court has serious reservations concerning the precise amount of sugar that may or may not have been present in these three bags since they were never actually weighed (Tr. 65–66; Wagoner depos. at 83, Ranallo depos. at 122; pltfs' exh. 59). For this reason, plaintiffs' damages are determined according to the average quantity of sugar per bag. The court calculates this figure by dividing the final tabulated net total based on the Westway weight tickets, 8,818,146.5 lbs. by the number of bags, 4,117, then multiplying that figure, 2,141.9 lbs. per bag, by the price of sugar, 12.815 cents per/lb. (Tr. 50, Ranallo depos. at 38), and then multiplying that amount, $274.48, by three since three bags are at issue.

Hence, the resulting damages award to which plaintiffs are entitled to for non-delivery of the three bags of sugar amounts to $823.44.

### II. Spillage of 15,460 lbs.

Plaintiffs' second claim for damages arises out of the spillage of sugar into the vessel's holds and onto the pier and road leading to the Westway weigh station. Following cargo discharge, Arbor Foods swept together piles of loose sugar and placed the sweepings into fifty-five gallon drums for weighing and storage (Wagoner depos. at 76). The parties agree that the sweepings, comprised of loose sugar (from leaking bags) mixed with dirt and gravel from the pier and road, weighed approximately 15,460 lbs (pltfs' post-trial findings of fact and conclusions of law at 8; defts' post-trial findings of fact at 5–6).

While the litigants do not contest the quantity of spillage, the issue before the court pertains to ascertaining liability for causation of the spillage. Toward that end, the matter is specifically addressed in the language of the charter party (incorporated into the bill of lading). Under clause seventeen (17) the vessel (and thus the carrier) was required "to provide and lay sufficient dunnage and mats, ... and to be so dunnaged and matted as to effectively protect and prevent the bags coming into contact with the edges of beams and stringer-plates" (defts' exh. A) [7].

The court finds that in accordance with this language the carrier was expressly obligated to load and care for the cargo in the above-quoted manner for purposes of protecting the bagged sugar during its transport, but nonetheless, the duty was completed in a negligent fashion. As a direct result, 15,460 lbs. of Blommer's sugar cargo became spilled and dirty thereby retaining no salvageable value (Tr. 41–42; Wagoner depos. 89–90; pltfs' exh. 59, 60) [8].

At trial, Uzmann summarized the method of discharging the bagged sugar from the vessel:

> The bags were lifted by a pendant sling hoist hook on each pendant. Some of the hoists were arranged for four, five, or six-bag hoists at a time. And stevedores were down in the cargo hold. They would attach the hooks to a sling rope grip on each bag that was integral to the bag, and then the bags would all be lifted simultaneously—four or five or six at a time—and lifted straight up by a crane and then swung over the deck and over to the side of the ship down to the dock face where it was landed on palettes [sic] that were by the stevedores on the dock. The palettes [sic] were then lifted by forklift and each individual bag was placed on a single pallet [sic] and each bag was lifted by forklift on to a farm

cart that was then towed to a scale by a number of jeeps ...

(Tr. 32). Although Uzmann reported that, generally, "[t]he offloading operation was carried out professionally and efficiently with excellent cooperation and teamwork from all parties" (pltfs' exh. 59), he commented, however, that during the course of unloading "a number of the bags were torn. Some with dunnage punctures ... you could see a 2–by–4 in the bag protruding into the bag ... and as they were lifted out of the cargo hold, sugar would spill out of those bags into the deck back into the cargo hold or across the ship's deck down on to the dock ..." (Tr. 33–34). Ultimately, Uzmann attributed the majority of the punctures to the following:

> [a]s explained in referenced Cargo Outturn Report [pltfs' exh. 59], *all or at least a major portion of losses* may be attributed to *improper or negligent loading practices* aboard the ship ... Insufficient plywood sheeting around sides of the cargo holds and looses dunnage left behind by the stevedores between levels of bulkbag stow caused holing of bags with subsequent spillage.

(pltfs' exh. 58; emphasis supplied).

Champness agreed with Uzmann's assessment of the cargo damage, noting ripped bags which were losing sugar as a result of contact with "broken plywood and/or the ships [sic] structure. As the stow settled, some bags in contact with sharp edges or the ships [sic] structure such as frames and ladders had become torn and were leaking." But Champness suggested that much of the damage resulted because the cargo was "very *loosely* stowed" (defts' exh. F).

Finally, Wagoner recalled observing a combination of totes that became ripped during the process of unloading, and totes that were discovered already torn open as

---

7. Admittedly, the M/V NOSIRA SHARON experienced *some rough weather during, at least, one segment of its transit across the Atlantic Ocean. The very purpose for a clause requiring utilization of plywood sheeting and dunnage mats, however, is to protect cargo from damage during inclement weather conditions.

8. This charter party obligation under clause 17 *is entirely consistent with a carrier's COGSA § 1303(2) duty to carefully load, handle and stow the shipment it has contracted to transport for the shipper or consignee. See Demsey & Assoc., 461 F.2d at 1016.

the stow was being discharged (Wagoner depos. at 23).

Irrespective of any particular theory of causation, the one common factual denominator establishing liability is proof that the damage resulted from some form of negligent or improper stowage on the part of agents or representatives of the carrier hired to load the vessel (*see* clauses 6, 14 and 17 of the charter party). The carrier, of course, bears the ultimate responsibility for care and custody of the cargo along with the accompanying burden of proving freedom from negligence for the resulting damage, or some excepted cause, which it plainly failed to sustain (*see* COGSA §§ 1303(2) & 1304).

Accordingly, the court holds that the vessel owner Nosira, *in personam*, and the vessel, *in rem*, are liable to plaintiffs for damages resulting from spillage of 15,460 lbs. of sugar. Since the sugar was valued at 12.815 cents per lb., the dollar figure representing the loss amounts to $1,981.19.

### III. Contamination of 353,430 lbs.

The final claim for damages emerges out of plaintiffs' discovery of contamination to approximately 165 bags or 353,430 lbs. of sugar from grist, grain and/or rotted corn infiltration into the space between the inner polyethylene liner and the outer canvas sleeve of each bag (pltfs' exh. 64; Wagoner depos. at 16).

The reason this condition presented a problem was due to the method by which bulk sugar is removed from its packaging. Usually, the bottom of the sleeve-type bulk bag would be untied over a mixing vat and the inner polyethylene liner severed. At once, the entire contents of the bag would empty which, in this case, would include the contaminants (Tr. 47; Wagoner depos. at 17).

Because there is little, if any, doubt that falling remnants from a previous cargo which dislodged from crevices within the two holds containing the bagged sugar account for the origin of the contamination, the controversy which the court must now resolve deals with the extent of the carrier's culpability (1) for the presence of this debris on the vessel, and (2) for any penetration into the confines of the bags themselves.

(1)

Plaintiffs contend that the carrier provided unclean and unsafe holds for the transport of the sugar cargo breaching its warranty of seaworthiness and breaching its duty to provide proper stowage. *See* COGSA §§ 1303(1)(a) & (c)[9]. More specifically, plaintiffs' assertion is that but for the condition of the holds the infiltration of contaminants between the liner and sleeve of 165 bags would not have occurred.

Generally, the determination of seaworthiness applies to whether the carrier has fulfilled its obligation of furnishing a vessel and appurtenances *reasonably fit* for their intended use; there is no obligation to supply an accident-free ship. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); *see also Blier v. United States Lines Co.,* 286 F.2d 920 (2d Cir.1961), *cert. denied,* 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961); *Grillea v. United States,* 232 F.2d 919 (2d Cir.1956). "The question is whether the appurtenances of the vessel at issue in the case at bar are 'within the usual and customary standards of comparable maritime activity' and this test is essentially a pragmatic one." *Passantino v. States Marine lines, Inc.,* 299 F.Supp. 1252, 1254 (S.D.N.Y.1969) (*quoting Poignant v. United States,* 225 F.2d 595 (2d Cir.1955)).

---

9.     (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—
    (a) Make the ship seaworthy;

    .     .     .     .     .
    (c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship

in which goods are carried, fit and safe for their reception, carriage and preservation.

Equally, it is recognized by the Second Circuit that stowage, in addition to hull and gear, falls within the scope of a carrier's warranty of seaworthiness. *Nuzzo v. Rederi, A/S Wallenco*, 304 F.2d 506, 508, *reh. en banc denied*, 304 F.2d at 514 (2d Cir.1962) (citations omitted). The *Nuzzo* court explained that:

> Just as the owner was 'under a duty only to furnish a vessel and appurtenances reasonably fit for their intended use,' as was said in *Mitchell*, so the owner's duty, with respect to the stowage of the ship, is only to furnish a *stowage* reasonably fit for its intended purpose. The purpose of stowage, of course, is a disposition of cargo within the vessel which will be *reasonably safe and convenient both for carriage at sea and for unloading at the destination*

*Id.*, at 509 (emphasis supplied).

Importantly, in the instant case, the Fedcom/Blommer charter party sets forth the understanding of the parties regarding the standard of fitness required within the stow holds prior to loading. In precise terms, clause 17 dictates in relevant part:

> Ship's holds to be odorless and free from insects, properly swept, cleaned and dried to the satisfaction of Shippers' or Charterers' Agents before loading.

(defts' exh. A). Defendants unsuccessfully attempt to interpret clause 17 as placing the burden of discovering the presence of the debris on the plaintiffs, and consequently, the liability for any harm, such as contamination to plaintiffs' cargo. But the court finds that clause 17 is not intended to relieve the vessel from its duty of providing a hold which, in compliance with the rule of *Mitchell* and *Nuzzo*, is "reasonably fit for its intended purpose"; rather clause 17 simply details the litigants' agreement as to what qualified as "reasonable" for the condition of the holds in preparation for transport of this sugar cargo.

Underscoring a previous finding, the stevedores loading the M/V NOSIRA SHAR- ON who failed to notice the breach were defendants', not plaintiffs', servants. Hence, as it is the carrier's obligation to see that the sugar was properly loaded, the carrier may not avoid the duty by securing the cargo owner's approval of the condition of the stowage holds.

*A Fortiori*, defendants' erroneous construction of clause 17, attempting to force an affirmative obligation upon plaintiffs to inspect the holds prior to loading, distinctly violates the duties imposed on the defendant carrier and vessel under COGSA §§ 1303(1)(a) & (c), and therefore falls. And since the duty to supply holds that were reasonably safe and clean for the care and preservation of Blommer's sugar cargo clearly lies with defendants, equally so, they bear accompanying liability for damages caused by the presence of these aforementioned debris in the holds.

(2)

The second factor bearing upon the culpability of Nosira and the vessel for contamination damage concerns the actual infiltration of the debris in the holds into the packaging of the bagged sugar. Evidently, the grain and other foreign material collected between the bag liner and outer bag of approximately 165 bags after dropping onto the stow during transit.

Reiterating plaintiffs' claim, it is their contention that had the M/V NOSIRA SHARON been in a seaworthy condition at the time of loading the hold would have been cleaned of debris. But as the vessel was not seaworthy, the bagged sugar became contaminated thereby compromising its value to plaintiffs.

Attempting somehow to limit liability for exposing the sugar to infiltration, defendants raise the statutory defense of insufficiency of packing pursuant to COGSA § 1304(2)(n)[10]. The contemplated rationale is that the outer bags of the sugar packages were open at the top allowing rotted grain and other external matter to enter and become wedged between the liners.

---

10. COGSA § 1304(2)(n) provides:

neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from insufficiency of packing.

Alternatively defendants propose that, in any case, once the damage was apparent plaintiffs failed to mitigate damages: "If the court finds that defendants are responsible for the grain between the liner and the outer bags of the some of the bags, the trial testimony discloses negligent care and utilization of the perfectly sound sugar [on plaintiffs' part] within the bags after the problem was perceived" (defts' post-trial brief at 6).

Certainly, the law is clear that "the responsibility of the carrier to stow and handle cargo properly, as set forth in 46 U.S.C.A.App. § 1303(2), must be read in conjunction with the exceptions set forth in 46 U.S.C.A.App. § 1304, in order to determine the respective responsibilities of each party." *S.M. Wolff Co. v. The EXIRIA,* 200 F.Supp. 809, 812 (S.D.N.Y.1961).

It is also accepted that in deciphering whether the carrier has exercised reasonable care in stowing cargo, the court must rely upon a rule of reason regarding the nature of the shipment and the method by which it is packaged. *Bache v. Silver Line, Ltd.,* 110 F.2d 60 (2d Cir.1940) (*"The Silversandal"*) ( [i]n the carriage of goods the trade must always come to some accommodation between ideal perfection of stowage and entire disregard of the safety of goods; when it has done so, that becomes the standard for that kind of goods) *Id.,* at 62.

█ Here, according to Uzmann's survey report, Blommer packed its sugar in "an inner blue PVC 3 millimeter inner liner ... [surrounded by] ... poly-weave stitched 1–ton sleeve-type cemin bulk bags ... All bulk bags were found *securely tied top and bottom* with 3/8″ poly rope" (pltfs' exh. 59; Tr. 64–65) (emphasis supplied). He testified in further detail regarding the bags:

> The outer polyweave bag was stitched around—like a collar was created around the polypropylene rope and it would cinch up when it was lifted whereas the liner was a clear plastic liner inside. It was simply pulled up inside and I believe it was secured with a little staple or a twist tie or something inside. It was not very secure, but I did not see any of those opened.

(Tr. 60). The function of this design, Uzmann explained, was to protect the sugar from the surrounding environment, and to provide an easy method of removal from the vessel (Tr. 58).

In point of fact, Uzmann observed with approval that, in accordance with his recommendations, this bag design signified a marked improvement over a previous bag design used to deliver bulk sugar (Tr. 78). More, Uzmann opined that the packaging adequately protected the cargo from experiencing moisture damage (plainly a common potential hazard during ocean transport), and from becoming stained due to the handling process (Tr. 67–68).

Conversely, the court notes a dearth of any contradictory testimony or physical evidence proving that the bags themselves fall within the category of "insufficient packing" for transporting this type of cargo. Therefore, the court concludes, these bags were reasonably suited to protect their contents, and in fact did so. But for carrier's negligence in preparing its vessel's holds the harm could have been totally avoided.

█ Although Nosira and the vessel are liable for the contamination, the issue remains whether Blommer undertook sufficient efforts to mitigate damages following discovery of the problem. At the outset, the court acknowledges that Blommer explored several options attempting to devise a way of removing the sugar from the contaminated bags without mixing the contents together, such as vacuum technology and the feasibility of pouring the sugar from a different position by cutting a hole in the side of the bags (Tr. 47–51: Wagoner depos. 101–110, 132, 138).

Plaintiffs insist that neither method was economically feasible, and for that reason the 165 bags, weighing 353,430 lbs., were sold to Arbor Foods for six (6) cents a pound (Tr. 49–50, 104–105; pltfs' exh. 32, 54; Ranallo depos. at 40, Wagoner depos. at 16).

The rationale behind plaintiffs' decision to sell this sugar to Arbor Foods was that

restrictive free trade zone regulations drastically reduced its mitigation options. Evidently, sugar entering a free trade zone is prohibited from being sold in the United States, unless it is mixed with another ingredient and thus not considered a raw commodity. Naturally, plaintiffs' maintain that efforts were made to obtain the best price for the sugar. Uzmann testified that he contacted a buyer in Canada, which would not breach free trade zone regulations, but the best offer was four (4) cents a pound (Tr. 115).

Defendants strongly question the persistence of Blommer's investigative efforts, professing, in fact, complete inaction on the part of the on-scene people, Uzmann and Wagoner, in dealing with the problem. They claim, further, that Champness was never notified of the problem, and thus effectively prevented from advising Uzmann or Arbor Foods with regard to the feasibility of using a device called an "evacuator" which in Champness' estimation would accomplish the task of extracting the sound sugar without the harmful contaminants.

In accordance with the evidence adduced at trial, Blommer's acceptance of the six (6) cent salvage price from Arbor Foods was reasonable, given the combination of factors involved with bulk sugar in a free trade zone. While it may be that Blommer did not scour the range of possibilities, on the other hand the court is not convinced, unlike defendants, that Blommer acted negligently in attempting to mitigate damages.

Moreover, the record demonstrates that Champness had sufficient opportunity to apprise Wagoner, if not Uzmann, of any alternative theories as to salvage. Plainly, Champness admitted discussing the problem with Wagoner around the time options were being contemplated, but declined at the time to mention his "evacuator" theory (Tr. 187–188). Given the highly speculative nature of Champness' testimony on the witness stand regarding this option (Tr. 186–191, 194), the court concludes that the most probable reason Champness failed to provide this information except during trial was that he did not consider it a viable option under the circumstances at the time of the incident.

Therefore, plaintiffs are now entitled to receive an award of damages equaling the difference in price between the salvage value of the 353,430 lbs. and the cost of the sugar had it been sound, or a net of $24,086.25.

## CONCLUSION

Plaintiffs have interposed several distinct claims for damages arising out of the shipment of a 4,000 m.t. bagged sugar cargo from Antwerp to Toledo onboard the defendant vessel M/V NOSIRA SHARON, to which defendants have asserted various responses. The following summarizes the court's determinations concerning plaintiffs' and defendants' allegations:

First, the complaint is dismissed as to defendant Fednav, *in personam,* for failure of proper service under Fed.R.Civ.P. 4(d)(3). The complaint is not dismissed with respect to Nosira, *in personam,* however, for the reason that defendants' theory suggesting a lack of contractual privity between Nosira and Blommer is incorrect.

Second, regarding the alleged short-delivery of 113,992 lbs. of sugar, based on the physical evidence there is no justification for plaintiffs' damages request; as to the three bags left onboard which the court found contained 6,425.7 lbs. (based on the calculated average yield per bag) plaintiffs are entitled to $823.44 from the remaining defendants, Nosira *in personam,* and the M/V NOSIRA SHARON *in rem.*

Third, liability resulting from the spillage of the 15,460 lbs. exists, for which the remaining defendants must also compensate plaintiffs in the amount of $1,981.19.

Fourth, with respect to the alleged loss of 353,430 lbs. arising out of exposure of the cargo to contaminants, again liability is established which entitles plaintiffs to damages equal to the difference in price between the salvage value of this portion of the stow and the cost to plaintiffs. or $24,086.25.

Additionally, to insure plaintiffs are made appropriately whole as a result of

their injuries, the court grants plaintiffs' request for pre-judgment interest [11] commencing from May 5, 1987, the date the vessel arrived in Toledo, Ohio. *See Iligan Int'l Co. v. S.S. JOHN WEYERHAEUSER,* 372 F.Supp. 859, 869 (S.D.N.Y.1974), *aff'd,* 507 F.2d 68 (2d Cir.1974) ([t]he award of interest on the amount recovered is within the discretion of the admiralty court ... [citations omitted] ... The allowance of interest is the general rule, and disallowance is supportable only in the face of exceptional circumstances).

Accordingly, the Clerk of the Court is directed to enter judgment in favor of plaintiffs totaling an amount of $26,890.88 with interest and costs, as discussed *supra.*

---

**11.** The rate at which pre-judgment as well as post-judgment interest shall accrue is to be determined according to the formula prescribed in Title 28 U.S.C. § 1961(a) (1988).